**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re, <br><br> Benjamin Charles Gecy, <br><br> Debtor. | Case No. 12-04129-dd <br><br> Adv. Pro. No. 13-80090-dd <br><br> Chapter 7 |
| Benjamin C. Gecy, <br><br> Plaintiff, <br><br> v. <br><br> Bank of the Ozarks and Michael Cerrati, <br><br> Defendants. | **ORDER** |

This adversary proceeding is before the Court on allegations of a violation of the 11 U.S.C. § 362(a) stay and the 11 U.S.C. § 524(a) discharge injunction by the plaintiff and debtor, Benjamin Charles Gecy ("Gecy" or "Plaintiff").  Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a).  Venue is proper under 28 U.S.C. § 1409.  This adversary proceeding is a core proceeding.  28 U.S.C. § 157(b)(2)(O).

The defendants, Bank of the Ozarks ("BOTO") and Michael Cerrati (collectively, "Defendants") answered and were granted leave to file amended answers.  A trial was held on the 26th and 27th of March 2014.  After careful consideration of the applicable law, arguments of counsel, and evidence submitted, the Court issues the following findings of fact and

conclusions of law under Federal Rule of Civil Procedure 52(a), made applicable by Federal

Rule of Bankruptcy Procedure 7052.[1]

## **FINDINGS OF FACT**

1.      Plaintiff is the sole owner of River City Real Estate, LLC ("River City").

2.      River City borrowed $569,000 from Woodlands Bank in February of 2008.  Joint

ex. 19.  The note had a maturity date of November 20, 2008.  *Id.*  The note was secured by

mortgages River City gave to Woodlands on the following properties: a first mortgage on 13

acres of land in Beaufort County, South Carolina; a first mortgage on a lot in Jasper County,

South Carolina; and a second mortgage on 1857 Ribaut Road in Beaufort County, South

Carolina.  *Id.*  River City owned the 13 acres.  Gecy individually owned the Ribaut Road

property, which was his office building.  Gecy also gave Woodlands a personal guaranty on the

loan.  *Id.*  The note was renewed in April of 2009 with a maturity date of April 20, 2010, and

renewed again in May of 2010 with a maturity date of July 20, 2010.  *Id.*  BOTO acquired the

note and mortgage after Woodlands was closed and the Federal Deposit Insurance Corporation

("FDIC") was named as receiver.

3.      River City went into default on the note, and on June 27, 2011, BOTO filed suit

against River City and Gecy in the Court of Common Pleas for Beaufort County, South Carolina

("Beaufort County action").  Joint ex. 4.  Cerrati represented BOTO in the Beaufort County

action.  In the complaint filed in the Beaufort County action, BOTO sought foreclosure of the 13

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

acres but not the Ribaut Road property. *Id.* BOTO also alleged a cause of action for breach of
Plaintiff's guaranty and sought a judgment against Gecy. *Id.*

4.     In their answer in the Beaufort County action, Gecy and River City asserted
affirmative defenses of unclean hands and breach of the duty of good faith and fair dealing. Joint
ex. 8. They also alleged a counterclaim for violation of the South Carolina Unfair Trade
Practices Act. *Id.*

5.     Gecy filed a petition under chapter 7 of the Bankruptcy Code on July 2, 2012.
Joint ex. 1.

6.     On October 16, 2012, an order was entered in the Beaufort County action
removing the case from the active roster because of Gecy's bankruptcy filing. Joint ex. 5.

7.     On October 26, 2012, Gecy received a discharge under 11 U.S.C. § 727. Joint ex.
2.

8.     On March 7, 2013, Gecy moved *pro se* to relieve Phil Fairbanks as his attorney in
his bankruptcy case. The Court scheduled the hearing on the motion for April 23, 2013. On
March 13, 2013, Gecy moved *pro se* for an expedited hearing on his motion. The Court held a
hearing on the motion on March 15, 2013, and entered an order relieving Fairbanks as counsel.

9.     Gecy retained substitute counsel for his bankruptcy who is also his attorney in this
adversary proceeding. His substitute counsel entered his appearance on the record in the
bankruptcy case on March 21, 2013.

10.    On April 1, 2013, the chapter 7 trustee's attorney, Michael Conrady, sent Cerrati
the following email regarding the 13 acres:

> Although the Trustee has the 13 acres listed for sale, it would be considered a
> short sale situation. As the property is owned by a single member LLC, although
> the Trustee can sell that interest as the sole member of the LLC, the underlying
> property is not subject to the automatic stay. We will continue to try to obtain an

offer on the property while you proceed with foreclosure.  If we obtain an offer prior to the completion of foreclosure, we would like to present that to you and your client for consideration.[2]

Joint ex. 22.

11.    That same day, Cerrati forwarded Conrady's email to Fairbanks with the following message:

> I received the below email from the Trustee's office concerning the 13 acres at issue[ ] in our foreclosure case.  In light of these comments, please confirm if Gecy is willing to dismiss or roll over on River City's counterclaims so that we can have a final hearing and proceed with a sale.  The Bank has a Motion for Summary Judgment ready to go, which we can argue or not based on Gecy's willingness to cooperate.

*Id*.  Fairbanks responded that he was preparing an order relieving him as counsel for Gecy and River City and that Gecy said he was "fine with you talking to him directly and you have my authorization to do so."  *Id*.  Fairbanks also forwarded Cerrati's email to Gecy.  Cerrati replied indicating he would contact Gecy directly but would "also likely get the motion filed so [he] [could] get a hearing date scheduled and keep this moving along."  *Id*.

12.    Gecy emailed Cerrati on April 5, 2013, requesting a meeting sometime the following week in his office to discuss a letter of intent he allegedly had on the 13 acres and to discuss how to resolve the litigation associated with the 13 acres.  Joint ex. 23.  Gecy testified Cerrati's indication a motion for summary judgment might be filed contributed to him requesting a meeting.  Cerrati responded that given his schedule, BOTO would prefer Gecy forward the letter of intent and any settlement proposal to him so he could review it with BOTO.  *Id*.  Gecy replied "[y]ou have made a fortune off these people . . . At least take the trip."  *Id*.  Cerrati

---

[2] In March of 2013, Cerrati sent two letters to the trustee seeking clarification as to whether the 13 acres was part of the bankruptcy estate.  Joint ex. 26.  This email appears to be in response to those letters.  It is not clear to the Court what authority the trustee had to attempt to sell the 13 acres, as it was owned by River City and is not part of the bankruptcy estate.

responded that he believed Gecy had a misconception of how he practiced law and that he was glad to meet with Gecy if Gecy wanted to come to his office. *Id.* Gecy then stated he would not be traveling to Cerrati's office in Bluffton, South Carolina because of his calendar of events in Beaufort and requested that Cerrati "[l]et [him] know when [Cerrati] [could] make it to [his] office to discuss the settlement of [their] differences." *Id.*

13.     On April 8, 2013, Cerrati emailed Gecy, stating:

> Please note that the Bank mailed a Motion for Summary Judgment on Friday, which should be filed today. Thus, it appears to be in everyone's best interest to exhaust any settlement options in the near future. However, given our scheduling conflicts, I would encourage you to forward the [letter of intent] to me for the Bank's review. We can then schedule a phone call to discuss any aspects that you feel require additional explanation.

Joint ex. 23. Gecy responded: "Now you have asked for trouble on this. I told you I was trying to help you guys and I see that does not mean anything to you or the bank." *Id.*

14.     The motion for summary judgment was filed in the Beaufort County action on April 9, 2013. Joint ex. 3. The first page of the motion states that BOTO is seeking "Summary Judgment against River City Real Estate, LLC and Benjamin C. Gecy . . . with respect to Bank's claims and for an Order dismissing the counterclaim and all affirmative defenses asserted by [River City and Gecy]." *Id.* On the next page, the motion states "Defendant Gecy executed a Guaranty in favor of Woodlands Bank, its successors and assigns on or about February 18, 2008, which obligates Gecy to reimburse Bank for all indebtedness of River City arising out of the Note, including any extensions and renewals thereof." *Id.* Page 4 of the motion provides that "[o]n July 2, 2012, Defendant Benjamin C. Gecy filed for relief under Chapter 7 of the Bankruptcy Code. Though Gecy was discharged in the bankruptcy proceeding on October 26, 2012, the bankruptcy case remains open." *Id.* Almost immediately following this sentence is the first argument heading, which states "Summary judgment for Bank on its Claims for Mortgage

Foreclosure and Breach of Guaranty Is Necessary Because Defendants Responses to the Requests for Admissions Have Been Deemed Admitted." *Id*.  The conclusion of this section states BOTO "is entitled to judgment on all of its causes of action against River City." *Id*.  In the conclusion to the motion, Cerrati indicated BOTO sought dismissal of the affirmative defenses raised by River City and Gecy, summary judgment on the counterclaim, and summary judgment on its claims against River City.  *Id*.  Consequently, the motion for summary judgment is contradictory in that it indicates BOTO is seeking summary judgment on the breach of guaranty cause of action in some places but then states in the conclusion that BOTO is seeking dismissal of the affirmative defenses and summary judgment on the counterclaim and claims against River City with no mention of the guaranty.

15.     The parties met to discuss settlement on April 17, 2013.  The day before this meeting Fairbanks emailed Cerrati: "I understand you are meeting with Ben Gecy tomorrow.  I just wanted to reiterate my authorization for you to discuss any matters with him without limitation in light of my not having been formally relieved as counsel for him or River City." Joint ex. 22.

16.     Gecy emailed Cerrati on April 19, 2013: "I did receive your [motion for summary judgment] . . . Looks like you did a nice job . . . I will let you know if I have any questions." Joint ex. 24.  Gecy admitted in his testimony there was some sarcasm in this email.

17.     The state court informed Cerrati that the motion for summary judgment could not move forward without the case being restored to the active roster.  Cerrati prepared an order and submitted it to the court on April 17, 2013.  Joint ex. 6.  A state circuit court judge signed the order, which was entered on April 23, 2013.  *Id*.  The order provided that because the stay in Gecy's bankruptcy "does not encumber the subject property owned by River City Real Estate,

LLC," BOTO could "proceed with its foreclosure action solely with respect to the claims against River City." *Id.* Along these lines, the order directed the case be restored to the active roster solely with respect to the claims and defenses relating to River City and concluded by directing that "[a]ll claims and defenses with respect to Defendant Benjamin C. Gecy shall remain stayed." *Id.*

18.    Gecy retained substitute counsel in his bankruptcy case and moved, on April 18, 2013, to compel the chapter 7 trustee to abandon three properties Gecy owned: 10 Chloes Way, 10 Meredith Lane, and 1857 Ribaut Road.  He also requested the trustee be compelled to abandon Gecy's interest in River City.  The trustee objected to the motion to the extent Gecy sought abandonment of the three pieces of real property but did not object to the abandonment of River City.  The Court entered an Order on April 23, 2013, compelling the abandonment of Gecy's interest in River City.

19.    On April 23, 2013, Gecy emailed Cerrati: "I would really like to resolve this matter and I am in hopes the bank can see the value in me dropping the case."  Joint ex. 29. Cerrati responded that BOTO would agree to accept a deed in lieu for the 13 acres without seeking a deficiency against River City.  *Id.*  Gecy replied that the proposal did "not sound out of the question."  *Id.*

20.    On April 25, 2013, Cerrati sent an email to Gecy and Fairbanks informing them that the motion for summary judgment was scheduled for hearing on May 30, 2013.  Joint ex. 29. Gecy responded "OK . . . sounds like I will see you there."  *Id.*

21.    On April 26, 2013, Gecy emailed Cerrati requesting to review the proposed release for River City.  Joint ex. 29.  Cerrati responded that the settlement documents were not usually drafted until a deal was in place but provided an example of what the release generally

said.  *Id*.  Gecy responded: "Got it.  I will review next week and email if I have any questions."
*Id*.

22.     This Court held a hearing on the motion to compel abandonment on May 21,
2013, and entered an Order granting the motion on June 4, 2013, noting the trustee consented to
the abandonment of 10 Meredith Lane and River City.

23.     Gecy emailed Cerrati on May 24, 2013: "I am agreeable to all of your requests in
settling this case and giving back the property.  My only request is that the property be listed
with [H]arbor Island Realty for a 6 month period from the date of deed in lieu.  If you do not
accept this final offer please contact Rob Mathison as he will represent me next week [at the
hearing on the motion for summary judgment]."  Joint ex. 30.

24.     When Cerrati and Philip Hartman arrived at the scheduled hearing on May 30,
2013, which was before the Master in Equity for Beaufort County, Gecy was without counsel.
Cerrati expressed some frustration that Gecy did not have an attorney because a limited liability
company such as River City has to be represented by counsel.  Fairbanks had given the order
relieving him as counsel to Gecy to file with the state court.  However, the order had not been
filed, and Fairbanks remained listed as counsel of record.  Upon learning that Fairbanks was still
the attorney of record, the Master in Equity directed that Fairbanks be called, and Fairbanks
participated by phone.  Fairbanks had not read the motion for summary judgment at the time of
the hearing/meeting.  At some point either Fairbanks or Gecy or both suggested the automatic
stay as a result of Gecy's bankruptcy was still in place.  Also at some point during the
hearing/meeting, Cerrati produced the order restoring the Beaufort County action to the active

roster as to River City only.[3]  Gecy testified that when Cerrati handed the order to the Master in

Equity, Cerrati stated he was not pursuing Gecy personally but rather only the 13 acres and River

City.  Gecy then told the Master in Equity the motion for summary judgment was against him

also.  No hearing on the merits of the summary judgment motion took place, although the parties

and the Master in Equity spent some time discussing settlement, including a possible consent

order.  Gecy testified he felt pressured by the Master in Equity to agree to allow the foreclosure

of the 13 acres to proceed while reserving his rights with respect to his personal counterclaims

and affirmative defenses.

25.     Gecy testified the May 30, 2013 hearing/meeting was the first time he had seen

the order restoring the case to the active roster, that he did not receive a copy of the order at the

hearing/meeting, and that there was not copy of the order in Fairbanks' file for Gecy.[4]  At some

point, Gecy obtained a copy of the record in the Beaufort County action, which included this

order.

26.     On May 31, 2013, Cerrati emailed Conrady and asked him the following question:

"While the Bank is not proceeding on any claims against Mr. Gecy resulting from his personal

guarantee of River City's debt, can you please confirm whether Mr. Gecy has retained ownership

of a portion of this counterclaim or whether it is still part of the bankruptcy estate?  Please note

that the counterclaim, which was identified on Mr. Gecy's Voluntary Petition, was filed jointly

---

[3] At a hearing prior to trial, Gecy's counsel conceded that what took place in front of the Master in Equity on May 30, 2013 was not a "hearing."  At trial, Gecy stated his attorney was wrong for making such a concession and insisted that what took place was a hearing.  Regardless of whether what occurred was a meeting, hearing, status conference, or something else, it does not affect the Court's ruling in this case, as the Court does not find that a hearing on the merits of the summary judgment motion occurred once the Master in Equity was told the automatic stay might still be in place.

[4] Cerrati testified it was common practice for orders restoring and removing cases from the active roster in South Carolina state court to be done ex parte.

on behalf of both River City Real Estate (the borrower) and Mr. Gecy (as the guarantor)." Joint
ex. 35.   Conrady responded: "The counterclaim (both the individual and LLC's rights) are
property of the estate.  If you would like to settle any rights the estate may have in the
counterclaim, so that it does not revert back to the Debtor (individually or th[ro]ugh the LLC) as
part of the Final Report, the Trustee would entertain any reasonable offer."[5]  *Id.*

 27. Also on May 31, 2013, Fairbanks emailed Cerrati on Gecy's behalf with Gecy
copied on the email:

> Ben asked me to communicate to you that his previously stated offer, to
> wit: settlement foreclosure lawsuit with consensual transfer of title to the 13 acres
> from Ben to the Bank, release of the lien on Ben's office building, mutual
> releases, and no 1099c issuance, with an exclusive listing agreement of Harbor
> Island Realty for the 13 acres, is still on the table.
>
> He also asked me to advise that he intends to instruct his current
> bankruptcy attorney, Mike Matthews, to file a motion for sanctions for violations
> of the automatic stay as a result of the continuation of the prosecution of the
> foreclosure action.

Joint ex. 9. Cerrati responded on June 3, 2013:

> Thanks for the email.  I have spoken with the Bank and, like your client,
> it's [sic] settlement position has not changed.   The Bank will agree to a
> consensual transfer of title to the 13 acres from River City to the Bank, to release
> the lien on Ben's office building, to waive any deficiency against River City Real
> Estate and to execute mutual releases, but it will not agree to the non-issuance of a
> 1099c or any exclusive listing agreement with respect to the 13 acres.
>
> In light of the apparent impasse, please confirm who will be representing
> Ben so that we can schedule a conference call with [the Master in Equity] this
> week per [the Master in Equity]'s comments at Thursday's hearing.  We hope to
> circulate the Consent Order of Foreclosure shortly.
>
> As for your client's threat of sanctions, I believe you are also in possession
> of the correspondence I received from [the chapter 7 trustee]'s office indicating
> that the collateral at issue here is not subject to the automatic stay.  However, we
> would be interested to obtain some information as to the bankruptcy court's
> position with respect to the ownership interest Mr. Gecy alleges to have in the
> counterclaim (separate and apart from River City Real Estate's ownership of the

---

[5] Similar to the 13 acres, it is not clear to the Court how River City's rights in connection
with the counterclaim would be property of the bankruptcy estate.

claim).  At your earliest convenience, please provide us with any documentation from the bankruptcy court regarding this claim.

*Id*.  Fairbanks replied to Cerrati with Gecy copied on June 4, 2013:

> Attached please find a filed Order signed by [the Master in Equity] relieving me as counsel for both Benjamin Gecy and River City Real Estate, LLC in C/A No.: 2011-CP-07-2679.  The Order gives Mr. Gecy fifteen (15) days to find substitute counsel.  As you know, I do not represent Mr. Gecy in his bankruptcy any longer.
> I am familiar with Mr. Conrady's opinion regarding the effect of the automatic stay in Mr. Gecy's Chapter 7 on the 13 acres titled in River City Real Estate, LLC.  However, I was not referring to that property when I expressed my opinion in last week's hearing about the application of the stay to the Bank's continuation of its prosecution of the foreclosure suit absent stay relief.
> Additionally, as I previously mentioned to you, the addition of the provision that the Bank not issue a 1099c in connection with a resolution of the foreclosure suit was *my* addition, not Mr. Gecy's.  You may delete it from the terms contained in my e-mail of May 31, 2013.

*Id*.

28.    On June 17, 2013, Cerrati sent Gecy and Fairbanks an email with the proposed consent order from the May 30th meeting/hearing attached.  Joint ex. 31.  Gecy decided to not sign the consent order and was concerned BOTO might pursue him for contempt of court.  BOTO has not pursued a contempt motion against Gecy.  The only action in the Beaufort County action since the May 30, 2013 hearing/meeting has been a motion for contempt filed *pro se* by Gecy.

29.    Gecy filed this adversary proceeding on June 18, 2013.

30.    The chapter 7 trustee filed the final report in Gecy's bankruptcy on July 15, 2013.

31.    With respect to actual damages, Gecy testified he had two houses his construction company was finishing around the time of the May 30, 2013 meeting/hearing.   After this meeting/hearing, Gecy spent some time gathering documents for his attorney in this adversary proceeding to review in making a determination whether to bring a lawsuit against BOTO and

Cerrati.  While he was gathering these documents and away from work, Gecy testified the person

helping him with the two houses painted a deck the wrong color and installed the wrong

screened-in porch on another house.  It cost between $1,000 and $1,400 to repair the porch and

between $2,000 and $2,200 to repair the deck.  Gecy also testified that, with respect to his

mortgage company, there were some interest rate increases and his company lost customers

while he was away gathering documents and speaking with his attorney because he was not there

to lock his customers into rates.  Gecy testified he lost between $15,000 and $20,000 as a result

of what occurred with his mortgage company.  He indicated he has paid the costs associated with

this adversary proceeding, which he believes are between $2,000 and $3,000.  He also stated he

paid about $100 for copying the record in the Beaufort County action.  However, no accounting

of the costs was provided.  Gecy drove thirty to thirty-five miles each way for both the April

17th meeting and May 30th hearing/meeting.

32.    As for attorney fees, Gecy did not know how much he owed Fairbanks for his

services in connection with the motion for summary judgment.  With respect to his attorney in

this adversary proceeding, Gecy paid him a $5,000 retainer for representation in this adversary

proceeding.  Gecy also agreed to a forty percent contingency fee.  The actual fee agreement was

not introduced into evidence.  Finally, Gecy paid his substitute attorney in the state court action a

$5,000 retainer of which $3,500 has been used so far.

33.    Gecy testified he suffered emotional distress during the time period in question.

However, he also indicated his primary focus prior to May 21, 2013, was on compelling the

trustee to abandon the bankruptcy estate's control over certain assets, and a good portion of his

asserted emotional breakdowns with family and friends were after the May 30, 2013

meeting/hearing.  Gecy's testimony was more to the effect that the motion for summary

12

judgment was an annoyance in April and May of 2013 because he was focused on the motion to compel abandonment.  Gecy went to a wellness practitioner and coach named Martha O'Regan during his bankruptcy for treatment of his alleged emotional symptoms.  She does not hold any medical degrees but is a licensed massage therapist.  O'Regan taught Gecy breathing and meditation techniques.  Gecy began seeing her for his symptoms in September of 2012.  Gecy did not have any office visits with O'Regan between March 7, 2013, and September 4, 2013. Joint ex. 25.  However, there were phone consults on April 11, 2013, and May 23, 2013. O'Regan did not recall Gecy talking with her about BOTO's motion for summary judgment but remembered Gecy was having financial issues.  Gecy improved initially with treatment but regressed in spring 2013.  O'Regan indicated Gecy owes her approximately $700.

34.     Gecy knew when he filed bankruptcy that if he received a discharge, he would be relieved of his personal liability for his debts, including his guaranty of the loan made to River City.  Fairbanks told Gecy he would be relieved of his personal liability on the guaranty if he received a discharge.  When Cerrati's attorney asked Gecy whether he knew his discharge wiped out his guaranty, Gecy responded:

> I guess that's the million dollar question Mr. Robinson: why would they pursue that.[6]  I also know you're not supposed to lie under oath.  But I don't know; I was confused.  I mean why would they be pursuing that.  Maybe they were.  Maybe they weren't.  It was my opinion that they were, and did I understand that the personal guaranty was eliminated in the discharge?  That's the way I understood it.  That's not the way I interpreted the motion for summary judgment.

35.     In a financial statement provided to BOTO, dated October 25, 2010, Gecy listed guns valued at $15,000 and jewelry valued at $22,000.  Joint ex. 34.  In his amended schedules filed in his bankruptcy on November 15, 2012, Gecy listed $500 in jewelry and $2,550 in guns

---

[6] The Court is not sure why this is a "million dollar question."  It seems as if the question is one for which a simple yes or no answer is sufficient.

and golf clubs.  Joint ex. 1.  There was an appraisal on Gecy's personal property after he filed

bankruptcy, and the figures in his schedules were consistent with the appraisal.  Gecy testified he

did not sell any jewelry or guns between October 2010 and November 2012 but did donate some

guns to a hunting club in North Dakota of which he used to be a member.  Gecy's wife testified

she did not sell any jewelry during this time period, she did not know of any jewelry that her

husband sold during this time period, and she did not remember him buying any jewelry during

this time period.  As for the guns, she was not aware of him selling or buying any guns during

this time period and was not aware of him donating any guns to a hunting club.


## CONCLUSIONS OF LAW

### A. Violation of the Automatic Stay

Gecy asserts Defendants violated the automatic stay by moving for summary judgment in

the Beaufort County action on April 9, 2013.  Gecy received a discharge under 11 U.S.C. § 727

on October 26, 2012, and the automatic stay as to all acts except acts against property of the

estate terminated on this date.  11 U.S.C. § 362(c)(1), (2).  The parties agree the 13 acres upon

which BOTO sought to foreclose was owned by River City; thus, it was not part of Gecy's

bankruptcy estate and not subject to the automatic stay.  *See* 11 U.S.C. § 541 (defining property

of the estate).   Similarly, to the extent River City asserted affirmative defenses and a

counterclaim for violation of the South Carolina Unfair Trade Practices Act ("SCUTPA") in the

Beaufort County action, this counterclaim and those affirmative defenses are River City's and

not subject to the automatic stay.  *See id*.  Moreover, to the extent the motion for summary

judgment can be construed as seeking to hold Gecy personally liable on the guaranty, it was not a

violation of the stay because the stay had terminated except with respect to acts against property

of the estate.  As for Gecy's SCUTPA counterclaim, the chapter 7 trustee had not abandoned it on April 9, 2013.  Therefore, this counterclaim was still property of the estate at the time BOTO moved for summary judgment with respect to the counterclaim.  *See* 11 U.S.C. 362(c)(1). However, this fact does not resolve the issue of whether seeking summary judgment on the counterclaim was an act proscribed by 11 U.S.C. § 362(a), which defines what acts are stayed by a bankruptcy petition.

Under 11 U.S.C. § 362(a)(1), the stay applies to "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."  The Fourth Circuit has not ruled directly on whether section 362(a)(1) stays further proceedings in connection with a counterclaim a debtor filed pre-petition but has indicated in an unpublished opinion that an action initiated by a debtor to seek redetermination of tax deficiencies owed to the Internal Revenue Service was not stayed by a bankruptcy petition because the action was not "'against the debtor'" but initiated by the debtor.  *See Reid v. Comm'r of Internal Revenue*, 878 F.2d 1430, 1989 WL 74867, at *1 (4th Cir. 1989) (per curiam) (quoting 11 U.S.C. § 362(a)(1)).  The Third Circuit has ruled on the issue and held that a pre-petition counterclaim by a debtor is not subject to the automatic stay. *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1992); *see also First Wis. Nat'l Bank of Milwaukee v. Grandlich Dev. Corp.*, 565 F.2d 879, 880 (5th Cir. 1978) (per curiam) (holding a federal district court had jurisdiction to dismiss a defendant-debtors' counterclaim "because the counterclaim was not a proceeding against the debtors."); *In re Regal Constr. Co.*, 28 B.R. 413, 416 (Bankr. D. Md. 1983) (concluding automatic stay did not preclude

15

chapter 11 debtor from proceeding on its counterclaim).  The Seventh Circuit has held that "the automatic stay is inapplicable to suits *by* the [debtor]," referencing section 362(a)(1) and (3) and the policy behind the stay.  *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *see also Parker v. Bain*, 68 F.3d 1131, 1138 (9th Cir. 1995) (holding a claim originally brought by a person who subsequently filed bankruptcy under chapter 11 was not subject to the automatic stay); *Carlson v. Norman* (*In re Duncan*), 987 F.2d 490, 491 n.2 (8th Cir. 1993) (noting a third-party action instigated by two debtors against a third party was not subject to the automatic stay); *Carley Capital Group v. Fireman's Fund Ins. Co.*, 889 F.2d 1126, 1127 (D.C. Cir. 1989) (per curiam) (holding section 362(a)(1) "by its terms only stays proceedings *against* the debtor, and does not address actions brought *by* the debtor which would inure to the benefit of the bankruptcy estate" (citations and internal quotation marks omitted)).  This Court finds these decisions persuasive.  Additionally, in determining what constitutes a "proceeding" subject to the automatic stay under section 362(a)(1), the Court finds the Third Circuit's approach persuasive:

> Whether a specific judicial proceeding falls within the scope of the automatic stay must be determined by looking at the proceeding "at its inception."  "That determination should not change depending on the particular stage of the litigation at which the filing of the petition in bankruptcy occurs."  Thus, the dispositive question is whether a proceeding was "*originally brought* against the debtor."
>
> All proceedings in a single case are not lumped together for purposes of automatic stay analysis.  Even if the first claim filed in a case was originally brought against the debtor, section 362 does not necessarily stay all other claims in the case.  Within a single case, some actions may be stayed, others not.  Multiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay.

*Maritime Elec. Co.*, 959 F.2d at 1204-05 (citations omitted); *see also Parker*, 68 F.3d at 1137 (applying Third Circuit's reasoning); *Duncan*, 987 F.2d at 491 n.2 (same).  Applying the Third

Circuit's reasoning, the counterclaim Gecy asserted in the Beaufort County action was a separate proceeding by him against BOTO not subject to the automatic stay under section 362(a)(1).  As for section 362(a)(3), the Court concludes it stretches the language of that section too far to find that BOTO's motion for summary judgment on the counterclaim "constituted an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

As for Gecy's affirmative defenses, the Court finds they do not constitute property of the estate for the simple reason that they are defenses, not claims based upon which a court can accord a person some type of recovery.  If Gecy were successful in asserting an affirmative defense, all that would happen is he would defeat the opponent's claim; he would not recover anything on account of the defense.  Moreover, Gecy appears to agree because the affirmative defenses are not listed as personal property on his bankruptcy schedules signed under penalty of perjury.  *See* joint ex. 1.

In sum, the Court concludes Gecy has not proven Defendants violated the automatic stay.

## B. Violation of Discharge Injunction

"Section 524(a)(2) of the Bankruptcy Code provides that a discharge in bankruptcy 'operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . .'"  *Bradley v. Fina* (*In re Fina*), No. 12-2526, 2014 WL 46166, at *2 (4th Cir. Jan. 7, 2014) (per curiam).  "Section 105 authorizes a bankruptcy court to hold a party in civil contempt for violating an order of the court, including a discharge order."  *Id.*  A two-part test applies when determining whether a party is subject to contempt sanctions for violating the discharge injunction: "(1) whether the creditor violated the injunction, and (2) whether he or she

did so willfully." *Id*.  "The willfulness prong requires only that the acts taken in violation of the injunction be intentional.  In other words, a good faith mistake is generally not a valid defense." *Id*. at *3.

The Court concludes that Defendants violated the discharge injunction.  The first page of the motion for summary judgment states that BOTO is seeking "Summary Judgment against River City Real Estate, LLC and Benjamin C. Gecy . . . with respect to Bank's claims and for an Order dismissing the counterclaim and all affirmative defenses asserted by [River City and Gecy]."  Joint ex. 3.  Additionally, the first argument heading in the motion states: "Summary judgment for Bank on its Claims for Mortgage Foreclosure and Breach of Guaranty Is Necessary Because Defendants Responses to the Requests for Admissions Have Been Deemed Admitted." This language suggests that BOTO is seeking summary judgment on its breach of guaranty cause of action against Gecy and thus violates section 524(a)(2).[7]  Furthermore, Defendants intended to file the motion for summary judgment, and thus their acts were willful.

Having found a violation of the discharge injunction, the remaining issue is damages. Gecy seeks to recover damages related to some mistakes made on two houses he or one of his companies was constructing.  However, Gecy's testimony was that a person who works for him made these mistakes after the May 30, 2013 hearing/meeting while he was away from the jobsite collecting documents to give to his attorney so they could decide whether to file this adversary proceeding.  Gecy cites no authority for the proposition that Defendants' actions should be considered the cause of the mistakes made on the two houses under these circumstances, and the Court finds that Gecy has not met his burden of proving Defendants' violation of the discharge

---

[7] Conversely, BOTO's efforts to obtain summary judgment with respect to Gecy's counterclaim were not a violation of the discharge injunction.  Gecy, through that counterclaim, was seeking to recover against BOTO, and the discharge injunction does not bar BOTO from defending itself.

injunction caused these damages.  Similarly, the Court finds that Gecy has not met his burden of proving Defendants' discharge injunction violation was the cause of the losses he suffered at his mortgage company during the weeks following the May 30th hearing/meeting.  Gecy's testimony again was that he was away from the mortgage company collecting documents to use in evaluating potential claims against Defendants.  He testified he lost customers because he was not there to lock them into rates prior to interest rates increasing.  However, he provided no explanation as to how his not being at the mortgage company prevented customers from being locked into particular interest rates.  In addition, aside from his testimony, he provided no other evidence to support the $15,000 to $20,000 loss he alleges he suffered at his mortgage company.

Gecy testified he drove thirty to thirty-five miles for both April 17th meeting and May 30th meeting/hearing.  With respect to the April 17th meeting, the emails in the record show that Gecy was requesting a meeting with Cerrati and BOTO even before he saw the motion for summary judgment or could have known that it addressed BOTO's breach of guaranty cause of action.  Therefore, the Court does not find that Defendants' discharge injunction violation caused the April 17th meeting.  However, the Court will award damages to Gecy for his mileage driving to the May 30th meeting/hearing with the Master in Equity.  Gecy had seen the motion for summary judgment at that point, and the evidence in the record suggests that he was not aware of the order restoring the Beaufort County action to the active roster.  This order provided that "[a]ll claims and defenses with respect to Defendant Benjamin C. Gecy shall remain stayed."  Joint ex. 6.  The Court deems $100.00 to be an appropriate amount for mileage incurred traveling to the hearing/meeting.  Gecy testified he incurred other mileage driving to and from meetings related to this adversary proceeding but gave no specifics or even an estimate as to the number of miles.

Gecy also testified he suffered emotional distress.  However, this Court and the Fourth Circuit have concluded that emotional distress is not an appropriate item of damages for civil contempt.  *See Burd v. Walters* (*In re Walters*), 868 F.2d 665, 670 (4th Cir. 1989); *Workman v. GMAC Mortgage LLC* (*In re Workman*), 392 B.R. 189, 195 (Bankr. D.S.C. 2007).  Gecy's counsel conceded this point in his closing argument.

Closely related to the issue of emotional distress, the Court declines to award any damages for Gecy's visits with O'Regan.  Gecy did not have any office visits with O'Regan between March 7, 2013, and September 4, 2013.  Joint ex. 25.  With respect to the visits on September 4th and 17th of 2013 reflected in the record, there is insufficient evidence for the Court to find that Defendants' discharge injunction violation caused these visits.  As for the two telephone consults in April and May of 2013, there is no evidence regarding what O'Regan charged for these phone consults.  The only information in the record is what she charged for an in-person meeting.

Although punitive damages have been awarded at times for discharge injunction violations, such damages generally are only appropriate when a creditor engages in "egregious or vindictive conduct," more akin to "conduct beyond willfulness or deliberation and more closely resembling a specific intent to violate the discharge injunction."  *Cherry v. Arendall* (*In re Cherry*), 247 B.R. 176, 190 (Bankr. E.D. Va. 2000).  The Court finds no egregious or vindictive conduct in this case.  Rather, the record reflects that eight days after BOTO moved for summary judgment, Cerrati filed a proposed order with the state court stating "[a]ll claims and defenses with respect to Defendant Benjamin C. Gecy shall remain stayed."  Joint ex. 6.  The state court entered this order on April 23, 2013.  Moreover, Gecy's own testimony was that at the hearing/meeting on May 30, 2013, Cerrati handed this order to the Master in Equity and stated he

and his client were not pursuing Gecy personally but rather only the 13 acres and River City. Additionally, the motion for summary judgment acknowledged Gecy had received a discharge in his bankruptcy, and in the conclusion, the motion indicated BOTO sought dismissal of the affirmative defenses raised by River City and Gecy, summary judgment on the counterclaim, and summary judgment on its claims against River City. The conclusion did not state that BOTO wanted a judgment against Gecy personally. While Cerrati and BOTO should have been more careful in their drafting of the motion, the Court does not find that they engaged in conduct warranting an award of punitive damages.

Finally, bankruptcy courts in the Fourth Circuit have "awarded attorney's fees against a party that violates the permanent discharge injunction upon a finding of contempt." *Thomas v. Resolution Trust Corp.* (*In re Thomas*), 184 B.R. 237, 242 (Bankr. M.D.N.C. 1995). Gecy's fee agreement with his attorney representing him in this adversary proceeding consisted of a $5,000 retainer and a forty percent contingency fee. At trial, Gecy's attorney provided an affidavit indicating he seeks in excess of $22,000 for time spent on this case at a rate of $175 per hour. Plaintiff's ex. 39. This affidavit did not include the one and a half days spent actually trying this case. Gecy's complaint initiating this adversary proceeding included causes of action for stay violation and willful stay violation under 11 U.S.C. § 362(k). If the Court were to conclude there was a stay violation and award attorney fees based solely on section 362(k), Gecy arguably might be limited to only recovering the attorney fees he is obligated to pay his attorney, as the language of section 362(k) suggests attorney fees are awarded as a part of actual damages. *See* 11 U.S.C. § 362(k) ("[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, *including* costs and attorneys' fees . . . ." (emphasis added)).

However, at the hearing on the parties' motions for summary judgment, the Court indicated it would view the pleadings in such a fashion as to encompass a claim for civil contempt based on a violation of the discharge injunction. Having found a violation of the discharge injunction, the Court is determining damages for that violation, not a violation of the automatic stay. Nonetheless, the Supreme Court has held that "results obtained" is an important factor in determining an award of attorney fees. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983). In this case, Gecy was unsuccessful in his pursuit of the claim asserted in his complaint, a stay violation. While the Court concludes Defendants violated the discharge injunction, Gecy has only proven $100 in damages. Such limited success does not support an attorney fees award in excess of $22,000. Rather the Court concludes that an appropriate fee award in this case is the $5,000 retainer Gecy paid his attorney.[8]

As for costs, Gecy and his attorney indicate Gecy agreed to pay the costs associated with this action. The affidavit of Gecy's attorney sets the amount of costs at $2,401.34, which is consistent with Gecy's testimony he had paid costs of between $2,000 and $3,000. However, no accounting has been provided of these costs, thus making it impossible for the Court or Defendants to evaluate them. Therefore, the Court will award no costs.[9]

---

[8] Part of the problem with assessing attorney fees in this case is the Court does not know the nature of the settlement discussions between the parties, if any, including whether Defendants offered Gecy a reasonable amount early in the case to settle it. The issue of whether offering such evidence in connection with arguing what constitutes an appropriate fee award would run afoul of Federal Rule of Evidence 408 is not before the Court because such evidence was not offered.

[9] There is no evidence in the record of fees Fairbanks charged Gecy for representation caused by Defendants' discharge injunction violation. There is also insufficient evidence for the Court to award damages for any fees charged by Mathison, as Gecy has not proven Defendants' discharge injunction violation caused the work resulting in the fees he has charged.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Court concludes Defendants are in civil contempt for violating the discharge injunction of 11 U.S.C. § 524(a).  The Court awards Plaintiff one hundred and 00/100 ($100.00) dollars in actual damages and five thousand and 00/100 ($5,000.00) dollars in attorney fees.  Defendants shall be jointly and severally liable for these amounts.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**04/25/2014**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 04/25/2014